We'll hear argument next in number 2010, 1395, Anrui Group Company against the International Trade Commission. We'll hear argument next in number 2010, 1395,      We'll hear argument next in number 2010, 1395, We'll hear argument next in number 2010, 1395, And I think everybody's set, Mr. Shumpert. And you're ready. Good morning, Your Honors. May it please the Court. The starting point for this appeal is the Commission's opinion, which is silent as to any misappropriation in the United States, and instead relies on, and I quote, the access that Tian Rui had to ABC trade secrets through former DACC employees. That access occurred in China, both companies being Chinese. Well, some of the access, I guess, occurred in Alabama, right? No, Your Honor. That was not found by the Commission in its opinion. I believe what Your Honor is referring to is that two or three of the people who moved from DACC to Tian Rui at one time, they had training. At the Calera plant in Alabama, right? Yes, Your Honor. And that occurred approximately 10 years before they moved to Tian Rui. But that plant did have the trade secrets. The trade secrets were involved in the process and structure of the plant, correct? That is correct. So there was exposure. They were exposed to the trade secrets. They were exposed to the trade secrets. But there is no finding in this case that any trade secrets were taken from the United States. The taking, the movement of the trade secrets. Taken as in carrying a piece of paper or taken in your head. I mean, if these people were in Alabama and they went to China and they knew the trade secrets, then trade secrets were taken in the literal sense of the term, right? Your Honor, I don't want to go beyond what is in the record or in this appeal. But there was a charge of misappropriation of, I believe, 260 trade secrets. There was ultimately a finding of 128 misappropriated trade secrets. And I don't think there is any suggestion in the record that any individual or group of individuals took 260 or 128 trade secrets from a two or three week training program in the United States 10 years before a plant was being built in China. And the commission. Is your argument that misappropriation occurs only in China because that's where the relevant secrets were transferred from the people who had a duty to keep them secret to the new employer that they had just signed on with? So that the entire act of misappropriation, in your view, occurred in China. Yes, Your Honor. And that is. Or it can't be unfair competition in the United States under 337A? That is correct. Not in this context. I figured you would say yes. Suppose that an employee of your company here in the US intends to misappropriate a secret, give it to your competitor in China. And he comes to your company. He learns the secret. He gets the secret. And then he says, hop on a plane with me. Let's go over the pond. And once he gets over the pond, into London or somewhere else, he then conveys the secret, then hops on the plane, comes back into the United States. Where did that act of misappropriation occur? First of all, I have to say that that is not this case. Second of all, I would say that that act of misappropriation occurred in the United States. And the commission could well have authority over that act of misappropriation, which did occur in the United States, even though the carrying of the information ultimately resulted in it. Why did that occur in the United States if the conveyance of the information occurred abroad? What makes this case different, then, if that is an act of misappropriation in the United States? To the extent that there is some consistency in trade secret law among the states is because there would have been a duty to maintain secrecy, an obligation of confidentiality, an acquisition of confidential information in the United States that was subject to a restriction, all of which was taken. In my example, the acquisition of confidential information was entirely abroad. I'm sorry, Your Honor. I understood you to say that the acquisition by the perpetrator occurred in the United States, who then carried the information abroad. Well, the employee learned the information in the US. In this case, didn't the employees learn the information while they were at the plant in Alabama? No, Your Honor. That is not what this record shows. That is not what the commission's opinion says. The commission's opinion is premised on documents that were found in China on people's computers and so on. But there's no suggestion that anything moved from the United States to China. But there is a finding, I take it, that all of the employees except Xi Renyi, I'm not sure about the pronunciation, but in any event, were subject to a contractual undertaking of nondisclosure even in the Chinese factories, correct? That is to say, the Amsteds licensed the Chinese factories, the ACC and Tong. The answer is yes, Your Honor. But that written undertaking came very late in the process and is subject to Chinese law. Well, but if there is an undertaking, then why isn't it, when you say late in the process, late in the process after they had disclosed the secrets? No. While they were still employed. While they were still employed by the ACC. Regardless of whether this occurred on the first day or the last day, they had undertaken not to disclose the trade secrets. And they did in contravention of their agreements, as found. I think that is the underlying question, Your Honor. Whether what they transmitted constitutes trade secrets under Chinese law in contravention of whatever confidentiality agreement they had in China, which was subject to Chinese law. That is the danger of the extraterritorial application of any statute, including Section 337. Well, if this case were not predicated in any degree on an agreement that had been entered, then it would seem to me that the default of the common law of the state or the statutory law of the state or country where you were present might have some significance. But where you engage in making a pledge of confidentiality, which you breach, then it would seem to me that puts this case in a rather different posture. I believe, Your Honor, the facts that you are describing are facts that would have to be determined in the state where these acts occurred. Even Illinois, under its conflict of laws, statutes, or holdings, would apply Chinese law. Chinese law was not applied here. But more importantly, there was no authority on the part of the commission to reach into China to determine what the facts were with respect to the events that occurred in China. And I think part of the proof of that, if you will, is that in the briefing before this court, the parties on the other side are actually trying to distance themselves from this very notion of extraterritorial application, suggesting that the misappropriation actually occurred in this country, not because of the event that Your Honor was asking about, but because of subsequent use of the railway wheels in an effort to import them, to sell them, to have authorization to sell them. And that use, under the Illinois statute, cannot be looked at in isolation, because use is either acquisition by improper means, again, means, and secondly, a duty to maintain secrecy. These are both matters of conduct that a foreign jurisdiction must adjudicate locally or require extraterritorial authority, which no one has ever suggested Section 337 provides. Mr. Schomburg, excuse me. Let me ask you, we have a JA-62, the initial determination of the ALJ in this case. And am I incorrect? Let me ask this one. Am I correct in thinking that we should accept for purposes of the various issues in this appeal the facts that are set forth in there, to the extent they're not challenged on appeal? I think the answer to that is yes, Your Honor, because we are appealing two issues as a matter of law. We say that the commission does not have the authority under Section 337 to reach into acts that took place, and we say, entirely in China. And the second argument is, as a matter of law, there is no domestic industry because of the way that concept has been defined by the commission. I ask that question because I wasn't clear, as a result of your colloquy, what I heard in your discussion with Judge Bryson as to whether there was some factual question or not. I believe, to the extent that there is a question about the word training, I believe that is used in the ID, but the initial determination, which was adopted by the commission. But the judge never suggested that the training of these people constituted the act of obtaining the trade secrets, which, to follow up on Judge Moore's question, was subsequently transferred in this case, something like 10 years later. Suppose that the Illinois trade secret law on misappropriation was quite clear, and it said, it constitutes an act of use, an act of misappropriation, to bring into the jurisdiction any product that has been made by someone else's trade secret. So the act of misappropriation isn't the theft and all of that, it's misappropriation is extended to include simply bringing the resultant product into the jurisdiction, even if the misappropriation occurred in China, entirely in China. So suppose that that was Illinois' law, and don't tell me that's unconstitutional or overreaching, because I'm not going to decide that part right now. But suppose that that's their law, what would, wouldn't it then be an act of unfair competition, which could fairly be reached under 337A, because then it would be an actual act of unfair competition in the United States, because it would meet Illinois' express definition of misappropriation? Well, um. I understand that's not the facts, but I just want to answer my question, which is the legal question. Wouldn't then 337 be implicated? I don't think Illinois has the right to legislate. I told you to accept that. I want to know whether 337 would then, 337A, would then reach that conduct. I would answer you this way, Your Honor. Section 337 is applied at the border. And if it can be established at the border, as it is in patent, copyright, trademark, common law trademark cases that the object that is being imported has something unfair about it, then section 337 applies. If you cannot make that determination at the border, I don't know how many state laws would have to be written. I would still argue that section 337 would not be implicated, because it is a border enforcement statute that derives its authority from Congress, which, at least according to Amtorg, is limited to acts that occur in the United States, as supplemented by Microsoft, by, and more recently in the Morrison Supreme Court decision. Suppose, here's what gives me pause about your position, particularly in light of your response to Judge Moore's original hypothetical about the trip to London. It sounds as if what you're saying is that it would be one thing, and perhaps reachable under 337, if there's a trade secret in a factory employing the trade secret here. Somebody takes a trip to London, discloses over there, and then the products are then shipped back. But that 337 cannot apply if the owner of the trade secret licenses, or even builds a plant in England, and obtains promises, does everything possible to ensure the protection of the trade secret, but the trade secret is disclosed nonetheless, and the products are imported back. 337 is simply, their hands are tied, and you're just going to have to ask the Director of Public Prosecution in London to take care of that problem. And that's exactly what the courts have said, Your Honor. That's what the court said in the Microsoft. There haven't been any court decisions with respect to 337 on this issue. You're correct about that, Your Honor. But with respect to a loophole, a gap, whatever you want to call it in the statute, which was apparent in the Microsoft situation, the Supreme Court said the remedy lies abroad. If you ship your, in that case, hard disk to London, and you find somebody copying it, you're going to have to go to London to get your remedy. You cannot use the patent laws in the United States. But here, the products are coming back. I mean, it seems to me the difference between this case and the great bulk of the extraterritoriality cases is that, sure, you don't have a cause of action under Illinois law, I'm going to assume, against somebody who discloses a trade secret in China, which is used to make railroad wheels that get shipped to Germany. That would be extraterritorial application of the Illinois law. But these are products that are coming back into the United States. That renders the conduct that's being regulated, i.e. the importation, not extraterritorial. It may mean that some of the activities are extraterritorial. But it doesn't, the ultimate cause of action is predicated on something that happens at our border. Your Honor, your decisions in the Amgen cases are very close to what you're describing. There were inputs that were not covered by the statute. The products came into the United States. And either the patent was not found to be infringed, because it was not covered by the process patent amendment, or the input was not considered to be an infringing input. There is nothing unusual about activities occurring abroad resulting, ultimately, in an importation, and our court saying, we can't reach that. And Section 337, with all due respect, does not give, in the words, I believe, of the Supreme Court in either Morrison or Microsoft, does not give the ITC or Section 337 authority to rule the world, and simply roam all over and say, that's unfair, that's unfair, that's patent infringement. It has to be in the statute. I see that. But if the act of misappropriation had occurred in the United States, you agree this would be different. If the act of misappropriation occurred in the United States, and then the product was manufactured abroad, because it's cheaper to do so, and then brought back in, that's what you think 337A is directed towards. Not 337A, 337. I'm sorry. I just received a note on the old 337A, which is the process patent amendment. That's A without parentheses. A without a parentheses. Thank you. Yes, you're correct, Judge. If it can be established that the misappropriation took place in the United States, and that misappropriation resulted directly in a product being manufactured abroad and back into the United States, our forum, our Illinois courts, our Georgia courts, would be in a position to determine whether something untoward occurred as that misappropriation was occurring. And then you have the border enforcement statute that says, oh, now we see it coming into the border, we're going, or across the border, we're going to stop it. I'm happy to answer more questions. We're not going to hold your feet to the fire on your time. I'm not exactly sure where I am. Well, you're actually beyond your time, but that's because we've been questioning you. And we, well, why don't we stop there and we'll restore your full rebuttal time if you need it. And may I address the second issue of my rebuttal time? Why don't you take a minute to address that issue if you like, and that will open the issue up for the other side. Thank you, Your Honor. Really, three quick points. First, there is no basis in the legislative history of the 1988 amendments to Section 337 that Congress was striving for the term that was used in the commission's opinion, logical symmetry. The purpose of the 88 amendments, as is quite clear from the legislative history, was basically to lower the burden, if you will, on statutory IP by giving them an extra test to establish domestic industry and eliminating the need to prove injury. So the rationale of the commission opinion does not work. This court's 1983 decision in shopper manufacturing company, just as we are urging here, recognized the longstanding domestic industry test applied by the commission as providing protection only for articles which come within the claims of the asserted IP. In that case, it was a patent. Nothing has changed with respect to that longstanding practice, and we've, of course, briefed that since 1983. The commission's decision in ink markers in 2005 being the latest example of this consistent approach in non-statutory cases. The final point I'd like to make is that Amstead basically took itself out of the ambit of Section 337 when it voluntarily closed its plan in the United States that had been using the ABC technology 10 years ago. It simply chose to focus on a different technology for its own business reasons. As the Supreme Court said in Microsoft, I found that its remedy, if any, lies abroad. OK, thank you, Mr. Schomburg. We have divided argument here. Ms. Kessin, you are going to be using, I believe, eight minutes. Is that right? Yes, Your Honor. OK. We will not hold you strictly to your time, but at some point, even a blank check can be exceeded. So go ahead. May it please the court. If you look at the basic issues in this case, both of them, in the commission's view, can be readily resolved by looking at the plain language of the statute. First, with respect to the so-called extraterritoriality issue, the statute is not at all extraterritorial. Section 337A1A clearly grants the commission authority over unfair competition or unfair acts in the importation or in the sale of the certain articles. Do you agree the unfair act itself or unfair competition has to be focused on the United States? On imports into the United States, yes. No, the underlying act that would amount to unfair competition has to be focused on activity in the United States. Your Honor, I think that the appellants have created a lot of confusion as to what they're calling this predicate unfair acts. There is nothing in Section 337 in Illinois trade secrets law, in any trade secrets law, that establish any such test. OK, well, here's my concern, counsel. My concern is, suppose that somebody at the border gets a bug in their ear about minimum wage, and they decide it's an act of unfair competition in China if they pay people $0.10 an hour to build this, because then they can bring the product in a lot cheaper, and that hurts our domestic industry. Well, that wouldn't be the kind of unfair competition that could then allow the border to stop those imports, correct? Correct. OK, so the unfair competition has to have a nucleus in the United States, meaning something unfair had to have been identified or occurred here in the US, not unfair competition that stems from differing treatment abroad. Well, the Unfair Act has to be in the importation of those products. And I think what appellants keep skipping over is that the Illinois law is very clear, and this was endorsed by the Northern District of Illinois District Court in the Cognizant case, that misappropriation under Illinois law is not just the acquisition. It's acquisition, disclosure, or use. And use has a very broad meaning. But use of the trade secret. Not use of the product that results from trade secret. The court goes on to say that articles that have been manufactured using that process embody. Articles embody that trade secret. Those articles themselves are subject to trade secrets law. And this is exactly what happens here. Show me where the Illinois court has defined the use, only the use, of a product that happens to have been manufactured by a trade secret that was stolen entirely abroad to amount to misappropriation in Illinois. That would be the Cognizant case, Your Honor, where the factual situation is a little bit different. But in Cognizant, the court did say that anything that embodies those trade secrets constitutes the misappropriation. One moment, I'll get a copy of that. Yeah, I've got Cognizant here, so you'll tell me which page to look at. OK. Maybe at 812. Yes, Your Honor, if you look at, I put this at 812, at 430, spits up at 12, saying there are no technical limitations in the nature of the conduct that constitutes use. Any exploitation that is likely to result in injury is a use. This marketing goods that embody the trade secrets, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret all constitute use. This is exactly what happened here. The TNRA respondents actually marketed this product in the United States. They used the trade secrets in order to get certification to sell those wheels in the United States. So they clearly engaged in exactly this kind of activities where the embodiment of the trade secrets was necessary for them to sell, market, and certify those products in the United States. In order for there to be a trade secret violation, there has to be a misappropriation, right? I mean, there has to be a duty to maintain the trade secret, which is breached. So where was the breach here? There is no contract. Remember, this is not a contract. You're talking about misappropriation, which is basically fraud. Well, I understand. But there still has to be a breach of a duty. And the judge found, the judge explicitly found that in the ID, he discussed all the details of the misappropriation. Yeah, but where did it happen? Tell me exactly what constituted the breach of the duty that was imposed on people who breached the duty. There were several breaches of duty. One of them was when the employees disclosed the information to Tian Rui. One of them was Tian Rui took the information. One of them was when Tian Rui used that information. Slow it down. Let's take them one at a time now. The employees, you say, had a duty. The employees, let's just take the employees who were in China, never in the United States, which I guess is either seven or six, depending on how you count. It sounds like they were two or three in Alabama, and six or seven in China. But with respect to the Chinese employees, from what does their duty arise? From the confidentiality agreements that they signed. You really are relying on the confidentiality agreements. No, we're not. Because, Your Honor, I would say. Suppose that, let's just, to make sure that that's your full answer, suppose there had been no confidentiality agreements, would there be no duty on their part? Your Honor, I want to point out again, that appellants have not disputed the underlying facts that these trade secrets were improperly disclosed to Tian Rui, that Tian Rui improperly used these trade secrets in the manufacture of these wheels. That might be a factual question that would have been relevant before the commission that was litigated heavily by the party, but decided by the judge and is not disputed now. The consulate all occurred abroad. That's the problem. I don't see the use in the United States. And as far as the Cogniz case goes, I would think that their distinction to you, which I think they actually made, but I don't remember for sure where, is that this is a case about the formula. This is like Coca-Cola. This is a case about the product. The trade secret is the formula. Right, and that's often the case. Right, but here, the trade secret is the process. So under Illinois trade secret law, it's not surprising for them to say use in Illinois, i.e. sale in Illinois of the product, when the product itself is the trade secret, amounts to use. But that's very different than saying use of a process is created simply when someone has the product. I want to point out that it's not disputed that the commission has authority over trade secrets policies, first of all. Respondents have admitted that, that the commission has authority over trade secrets. How is the commission to exercise its authority over trade secrets if it's not to look at the articles upon importation? That's when the commission has to. There has to be some manufacturer of the product overseas. There has to be something that happened overseas in that manufacturer before the products entered United States. And Congress clearly intended the commission to have authority over trade secrets as stated in the legislative history. So the only way the commission could have jurisdiction or authority over trade secrets, you'd have to have some acts that occur overseas. The farm manufacturer using the products. Sure, but why isn't this directed to when a misappropriation actually occurs in the United States? Namely, two employees in the United States convey a secret. It's then communicated abroad where it's manufactured. So the conveyance, the stealing, the theft of the secret, the misappropriation occurs entirely in the US. And then it's conveyed abroad for purposes of manufacture because it's cheaper to manufacture abroad. Then when those goods are imported, you have an act of misappropriation that occurred in the US. I think my fundamental problem with your position is I don't see an act of misappropriation in the United States. And if that's the case, I don't see how this is any different than minimum wage and everything else in China. I think, again, if you look at the Illinois trade secret law, it's very, very clear that it's not just acquisition or disclosure. It can also be use of a product. Even under a contract. Not use of a product, but I don't agree with you. I don't see where Illinois law says use of a product amounts to misappropriation of a process. Even under Appellant's own theory of the case, which we think is an overly narrowly restrictive view of Illinois law, even under their own argument, they argue that as long as you have an improper acquisition in the first instance, every subsequent use of that article constitutes misappropriation. They've acknowledged that. They've stipulated importation and sale. Even under their argument, here where the judge has found. I see their argument as consistently saying there is no misappropriation that's occurred in the United States. I see them saying that throughout all of their briefing. I think that you're either, I'm misunderstanding what you're saying, or you're radically misrepresenting their argument. I would invite you to read the entirety of their reply memorandum on the motion to terminate, which they have put in selected pages into the appendix. But I would invite you to read the entire memorandum, because I think their argument is set out very clearly there. That they believe the scenario that you said, if an employee is trained in the United States and meets with a foreign representative in the United States and discloses the trade secrets, and that foreign representative then goes overseas and manufactures the product, that's OK. The importation of that product constitutes misappropriation under the trade secrets laws under Section 337. If that same employee goes to the Bahamas and meets with that foreign representative, and that representative then goes back to his home country and manufactures and imports the products, their claimants are just out of luck. That's what that theory is. And I think it's very clear if you read the papers they thought before the commission. Let me ask a question, if I could. We've all been talking about Illinois trade secret law, and it's certainly the case that the administrative law judge said that Illinois trade secret law was the critical body of law to look to based on an opinion of this court, which dealt with a supplemental jurisdiction trade secret cause of action, where obviously you applied the state law, because that's the law you apply. But it seems to me that given the nature of the statute, which is unfair practices, that it may make more sense to look to what the commission had previously said in Copper, Rod, and Sausage, which is this is a sort of federal common law question. Would you agree with that, as opposed to looking to a particular state and then having the difficulty of figuring out which state is the state to look to? I would note that the ALJ found in his ID that whichever, whether you apply the commission's previous practice, or you apply Illinois, it gets the same result. I understand. And these trade secret laws are all the same. In fact, I gather that the Chinese trade secret law reads pretty much the same as ours. I think appellants argue otherwise, which is why they went over to China to have a case. Very well. Go ahead. And I believe that ALJ found that the same findings would have been made, even if they had not. Just as a matter of the way we should approach this, it seems to me peculiar to be talking so much about Illinois instead of talking about what Congress did, which was to say to the commission unfair practices, and then referring too generically to a number of anti-competitive practices that sound like they invoke a kind of federal common law. And the commission certainly would, if the court instructed us that way, the commission certainly would have no problem with that. Would you urge the court to instruct you to that effect? I think it would make it easier for the commission and parties in the future to know just what they are expected to approve and not approve in trade secret cases. Let me ask you one question. Is it your view, we're just speaking generally, leaving aside the facts of this case, that under 1337, there only has to be importation into the United States? That's enough? Well, your honor, I think it is. Is it your position? Generally, is it your position that there doesn't have to be a misappropriation of a trade secret within the physical boundaries of the United States? Misappropriation meaning an improper conveyance from A to B of a trade secret. I think any way you slice it, because since importation is a use, and that type of importation would, in fact, be a misappropriation. Still, one doesn't agree that importation is a use. But I also want to remind you. Oh, excuse me. Assume one doesn't agree that importation is a use. In other words, that importation is just getting it to the border. Is it enough that there have been, in other words, do you have to have an improper conveyance of information in the United States, in your view? No. And I would point out, though, that there is a check on all of this in 337A, because you have to prove substantial injury to the domestic industry. It's not just an importation. The unfair act in that importation has to cause substantial injury to the domestic industry. Chris, can I just add one point that I think, Judge Moore, that you asked earlier? And one factual point that I want to clarify about where the employees are trained in judges' findings on that issue. I think if you look at the ID-attribute flex, at JA 89 to 91, 97, and JA 99 to 100, the LJ actually discusses that the ABC process was developed in the United States at the ABEX facilities. And he also discusses that at least two of the poached employees were trained in the ABC process for manufacturing Castile railway wheels at the Calera facility. I just want to point that out, because I think that's very clear that that is in the ID and it was a finding by the LJ. OK. Well, so here's what I'm struggling with from a statutory interpretation standpoint. 337A is virtually unchanged from 1934 to the present, 337A. And for a long period of time, there was a question about whether or not process patents, when the process was made abroad or used abroad and the product was imported into the United States, would fall under 337A's unfair competition rubric. And our courts went back and forth a little bit. And we have the mTOR case. And then we have Congress. In the mTOR case, the federal circuit, or the CCPA, our predecessor, which we're bound by, held that 337A in this regard did not protect when the process was used abroad. That couldn't fall under 337A. And Congress stepped back and said, wow, that's a perverse result. We don't like that result. And so they enacted a special statutory section, 337B, to, well, it was originally different. It evolved from 1940 forward. And now it's 337B. So I think given that history, what I'm struggling with is how do I say that use of a trade secret abroad, which sort of parallels use of the process patent abroad, because both of these are methods, falls squarely within 337A when our own mTOR case held it didn't for process, and Congress needed to specially create a statute for process to make it fall within. That's what I'm struggling with, pure statutory interpretation. As this court explained in the 1990 Amgen opinion, what the court had found in mTOR was that there was nothing to justify extended patent protection beyond the protection provided by substantive patent law. And that's the key right there, is that at the time that mTOR was decided, there was nothing in the US patent laws that protected process patents overseas. If you had gone to district court, you would have been out. There would have been a claim there. There was not a claim in the commission. Here, the commission's view is there is something in the substantive trade secrets law that does, in fact, find this to be an unfair act. And therefore, under applying substantive trade secrets law, there's something in trade secret law that finds misappropriation entirely abroad to be an unfair act. Again, that finds misappropriation in the importation, sale, marketing, and certification for competition with the US industry to the detriment of that industry to be a violation of the trade secrets law, yes. OK. Thank you. No further questions. We'll hear now from the domestic industry. I don't know if Mr. Pelletier is intending to address it. If you have, I gave Mr. Schomburg a minute. Why don't you take a minute? Just to make a couple of points. Again, as we set out in our brief, it's very clear from the base of the statute that Congress in 337, 8, sub 2, included only the acts falling under B, C, D, and E as those that are subject to technical prongs. So just reading the base of the statute, it's very clear. I would also point out that even if we buy Appellant's argument that there was some longstanding commission practice for all IP cases, statutory and unstatutory alike, they still wouldn't prevail. Because if that was so, then why did Congress ever have to pass 337, 2 at all if, in fact, all IP cases were already covered? There would have been no need to even include that provision if they were right in their analysis of why Congress and after that provision did not include 337, 8, 1, 8 cases. OK. Thank you. And now, Mr. Pelletier. Good morning. May it please the court, Dean Pelletier on behalf of Amstead, the intervener. Allow me to dispel one myth. Misappropriation occurred in the United States. On JA 131 through 132 of the initial determination, the commission expressly found that the appellants relied on Amstead's trade secrets to obtain AAR certification. That's no small issue. AAR is the Association of American Railroads located right here in Washington, DC. But where's the breach of misappropriation requires a breach of duty, right? I think we can all agree with that. With all due respect, Your Honor, not under the Illinois Trade Secrets Act. If you look under the Illinois Trade Secrets Act, and previously what's been cited to you is common law under Illinois that predated the Illinois Trade Secrets Act. In some cases, there must be a duty. But breach of a duty comes in only when improper means is an element of the misappropriation cause of action. Improper means is not an element of every misappropriation cause of action under Illinois law. What's misappropriation that doesn't involve the breach of a duty? It could be that you knew or had reason  at that time were derived from a person who had a duty. But there's no mention of a breach. In effect, the duty is extending to you by virtue of your knowledge. But if you don't have knowledge, you don't have a duty. If you don't have knowledge or reason to know, the trade secret, it wasn't intended to be waived, but it showed up on your doorstep one day quite by mistake. You have no duty. And therefore, if you make use of the trade secret, you haven't violated the Illinois trade secret law, right? Well, under those circumstances, you would not have violated it. And the reason is because you don't have a duty. Well, the duty, of course, and just to clarify, the duty can arise in multiple forms. I understand, but there has to be a duty. You started off by saying, well, no, it isn't always required. But it is, right? There has to be a duty, but there is no express requirement in the statute for you knew or should have known of a breach of that duty. Well, why? I don't understand that. Well, under 765 ILCS 1065-2, which is the Illinois Trade Secrets Act, which defines misappropriation, there are multiple forms of misappropriation. Acquisition, disclosure, or use, it's a disjunctive test. Acquisition of a trade secret by itself is not misappropriation. If I'm working at the plant and they give me the trade secret, they want to give it to me, they intend for me to use it, that's not misappropriation. That's simply possession of the trade secret. At some point, I have to do something wrong, or somebody else, knowing that I have the trade secret and a duty, has to do something which is a breach of duty, right? If you do not have the consent of the trade secret owner, that's correct. OK, now we're all back on the same page. There has to be a breach of the duty, of a duty. Under the plain language of the statute, the Illinois Trade Secrets Act, the breach comes in expressly in the definition of improper means. And the Illinois legislature has specifically called out, when you are relying on a portion of the statute that requires improper means, breach is one way to show improper means. OK, where is the breach in this case? Where is the improper means that was used? Improper means contrary to duty, and contrary to duty means a breach. So I'm using those terms interchangeably. So we're on the same page. That's a very good question. Where did that happen here? That's a very good question. There were multiple instances of that breach, because there are multiple instances in which the appellants knew or had reason to know that they had derived the information from people who had a duty. Those people, we talked earlier, the panel did earlier, about the training in Calera. The disclosure of the trade secrets in Calera were in confidence. There's the first duty. Where are the findings that we should rely on with respect to the Alabama plant? I've got one source of the, just to start you off, I guess, on, well, I thought I had it here. There's a reference by the administrative judge to the Calera plant, and the fact that two of the employees, Chi Renyi, I guess, and one other were at the Calera plant. But does the, yeah, this is at JA99 to 100. Yes, I'm right there. Does the administrative judge make a finding that they obtained the secrets at that point? Because Mr. Schomburg says, no, that's a stretch. Because the administrative judge, according to Mr. Schomburg, never really found that they obtained and carried with them, in effect, whether in their head or otherwise, trade secrets. What's your take on that? They absolutely were exposed to the trade secrets, because the trade secrets are embodied in the ABC process that they were instructed in. OK, and how do we find, based on the administrative judge's findings, how do we conclude that they conveyed what they learned in Alabama, ultimately, to the petition, really? Well, the factual question of what the trade secrets are is not in dispute. And those were taken, those were originally implemented, if you will, or implemented at the Calera, Alabama facility. And then when the Calera, the technology was transferred through an agreement to DACC, the same technology in Alabama that these folks specifically came over to get up to speed on. So when this technology was provided to these people, they were intimately familiar with it from the days in Calera. It was used in DACC. That same technology, they were then made aware of was confidential. How? By the employee confidentiality agreements, also by an employee code of conduct. Well, now, the judge says, at one point, that Xi Wenyi, I guess, did not sign the confidentiality agreement. The other eight did. Yes. What's the situation with him? Not only was he the only one of the nine that left that didn't sign, he was the only one that didn't sign. I understand. And it was conspicuous, because three months later, he decided to leave to go to work for TNRE. Yes, but where does his duty come from? Employee code of conduct, which he was expressly made aware. And that's in the judge's initial determination, hence the commission's determination, that the employee code of conduct specifically called out obligations with respect to the confidential information, including the trade secrets. And as to the other seven who were all entirely based in China, had never gone to Alabama or anywhere else, you say their duty arises from what they're signing the confidentiality pledges plus the employee code of conduct? Yes, at least that, as well as being reminded of their obligations at various points in time. Section 337 is a trade statute. Section 337 regulates and addresses importation.  We won't hold you strictly to your time. Would you agree with Ms. Kasson that this should be looked at more as a federal common law of trade secrets, as opposed to Illinois law, or Vermont law, or Georgia law? Or do you think a state law referent is correct? State law is correct, as the Supreme Court has stated in several decisions, that a trade secret law is a creature of state law. It's fully developed in many states. Trade secret law is, but the trouble is we're not dealing with a statute that talks about trade secret. We're dealing with a statute that talks about unfair methods of competition, one of which has been regarded as being something in the nature of trade secret violation. But that doesn't lock us in to applying state law, it would seem to me. Why shouldn't we apply what the commission has traditionally done, which is to say, you look to the general law of unfair competition, including trade secret? I think because, for the same reason that you would look to state law in any other circumstance, there are fully developed areas. I would have thought, Mr. Pote, you'd agree with Judge Brassett. He's opening a little bit of a door for you, maybe. I mean, he's saying, correct me if I'm wrong, but I understand to be saying, OK, fair enough, trade secret violation is one thing to be considered under 337. But is it the case that we're not limited to that, with the sausage case in mind? I do not believe that you would. I do not see how you would be. He said it's unfair competition. Yes. And any unfair competition, the theory would be federal common law would develop what unfair competition is. And if there is such unfair competition, at the end of which there's an importation, 337 applies. If there was such a sufficient body of law to proceed under, I think it's just a situation where, to me, it doesn't appear to be that much of a difference to go from state law to state trade secret law, which is fully developed in many instances. This all emerges, it seems to me, as a historical matter, from the first such statute, which was the Federal Trade Commission Act, right? That was the first one of these statutes that was enacted. It talked about unfair methods of competition. Supreme Court construed that statute on several occasions to mean you look to the general law, not you don't look to the law of Alabama, and so forth. So it strikes me as kind of peculiar to say, ah, but when we get to 337, we have an entirely different take on it, because it's the same language, exactly. I don't see there would be a difference in this case. It would not be determinative of the outcome in this case. But I do not see how it would matter. Did either party at any point argue federal common law, or hasn't it been accepted by both parties that Illinois state law applies? Nobody argued federal common law. Just want to make sure I understand from a factual standpoint. Can I ask you to address the sort of last question I asked to Ms. Kessin as well, which is how, under a pure sort of statutory interpretation rubric, how do you ignore what happened in Amtor and Congress's conclusion that it was necessary to break out and separately protect the process patents under 337B? They didn't say anything about trade secrets or any other form of unfair competition, but they expressly broke out process patents. Why doesn't that, under a pure statutory interpretation rubric, mean that this exact type of activity, if it all occurred abroad? Assuming I didn't agree with your misappropriation in the US argument. Assume that it all occurred abroad for my hypothetical. What happens then? Amtor was not about extraterritoriality. Amtor was about a gap in the Patent Act, the substantive underlying law. This court in Amgen concluded the exact same thing. Amgen was the exact same issue. Does substantive patent law cover the act? If that act had occurred here, would it be covered under the Patent Act? Well, but Amtor was about whether 337A, 337 then, would cover, as a form of unfair competition, someone's use of a process protected in the US, but fully used abroad to be able to block imports coming in that had resulted from that process. I mean, it seems almost identical. If I don't believe that misappropriation occurred in the US in this case, it seems almost identical. It's just that there, the process was protected in the US by a patent. Here, the process is protected in the US by trade secret. But it's still the attempt to import the resultant product. I don't see why it's not sort of on all fours. Because there was no provision in the substantive underlying law in the Patent Act to render, as an act of infringement, use of a product made by a patented process. But you agree. Hold on, hold on, hold on, because I need to stop you there. So I understand your point perfectly. But you do agree that it's not an act of misappropriation. Suppose they never tried to import this product into the United States. Those Chinese companies who brought the employees over and the employees revealed the secret to them, only then sold the products in China, never brought them to the United States. That's not an act of misappropriation. Correct? That is not violating any underlying US. That would not be a violation of Section 337. Or any misappropriation under Illinois trade secret law. Right, it becomes actionable and unfair under 337 upon importation. Then why didn't the process patent, as a form of unfair competition, become actionable and unfair under 337, even though it wasn't separately protected? Because at that point, I'm trying to get into the head of the court, but I think it makes perfect sense, is that the Patent Act didn't say use of a product made by a patented process, sale of that product made by a patented process, is an act of infringement. Under Illinois law, use is a broad concept. Use of a product made by a process comprising trade secrets is use of the trade secrets. So here, use of the tea and rewheels is use of Amsted's trade secrets. And it amounts to misappropriation. I understand your argument perfectly. If Illinois law, however, said, which I know it doesn't, but if it said expressly, it's not misappropriation to use the resultant product, only the use of the process is an act of misappropriation. OK, suppose that's what Illinois trade secret law said. Then would you agree 337A would not be allowed to bar the importation of these products? Under the facts currently, under only those facts? Under my hypothetical facts. Just those facts? So we have no AAR approval. Yes. We have no disclosure in the United States. Correct. All of that's out. Then it would be a much more difficult case to make. And under the facts, I haven't fully digested your hypothetical. But as I stand here, I think that might be a difficult case to make if everything took place abroad, and Illinois law was 180 degrees from where it is today. Then you would agree, though, that 337A wouldn't allow you, as a form of unfair competition, to block that import under those circumstances. So none of the other facts of record are here?  None of those facts are here. I might argue that federal common law applies at that point. OK. OK. Very well. We'll hear from Mr. Schaffer. Could I make one comment, if I might, Your Honors, on the domestic industry issue? In 1988, the statute was amended. Congress specifically created a statutory dichotomy for the domestic industry requirement. Key to that analysis is in the legislative history, Senate Report Number 100-71, dated June 21, 1987, at pages 128 and 347. Congress expressly considered grouping trade secrets in with federally protected intellectual property rights for purposes of the domestic industry requirement. Congress rejected that approach. The plain and unambiguous language of the statute bears that out. There are two separate domestic industry requirements under Section 337A1A. The domestic industry requirement does not require a technical prong. The domestic industry requirement under Section 337A1A is satisfied, as it was here, by showing the existence of domestic operations that are the target of the unfair acts and practices, taking into account marketplace realities. The commission's determination of violation and intermedial orders should be affirmed. Thank you. Now, Mr. Schomburg, you're up. Just to address quickly the questions you raised, I would refer the court to JA84, which lays out the Illinois statute that Mr. Pelletier cited. And I think your honor, in fact, all of your honors will find that there is a requirement of the kind of conduct we've been talking about. Second point I'd like to make is your sausage casings question, Judge Bryson. The interesting thing about sausage casings, and ties it actually to the Morrison case, as I believe Judge Moore has indicated, is that the Morrison case was brought at a time where the statute only talked about unfair methods of competition and unfair acts, as was the sausage casings case, because that was not a statutory IP act. In both of those cases, the court said, in Morrison, we cannot exclude these products. We cannot find a violation of section 337, because there is nothing in the statute that would allow us to do that. In sausage casings, no one raised the issue of extraterritorial application of the statute. And the court in Amtor had earlier said, if something has not been argued to us, as it had not been in the cases that Amtor, in effect, overruled, we reserve the right to reconsider that, and in fact, then overruled those earlier cases. So whether you're using common law or Illinois law, you're still focused on unfair methods of competition, unfair acts. Yeah, I don't think there's any substantive differences, which I can see. Thank you. It's just a matter of, well, OK. And I would just like to add to the arsenal here the very well-known case of Chenery, which we did not cite in our briefs, but of course, is Supreme Court law that basically says a rule of administrative law is a reviewing court in dealing with the determination or judgment which an administrative agency alone is authorized to make must judge the propriety of such action solely on the grounds invoked by the agency. And then it goes on to enlarge on that somewhat. So to the extent that the commission and or Amsted is trying to reorient, rewrite what the commission has done here, I think there is a point beyond which a reviewing court cannot go in order to sustain what the agency has done. And finally, as a purely factual issue, if Your Honor is focused on it, you have mentioned the name Xi Renyi a couple of times. If Your Honor is interested, first of all, his employment contract is referenced at JA 95, not by name, but in a long series of citations by the judge. Sorry. Sorry. And one of those citations, I believe it's the one to 113, is a reference to CX 33C, which is a confidential exhibit, which is the employment agreement that was offered to Mr. Renyi. And it contains, as well, his reasons for rejecting it, should the court be interested in that detail. Very well. If there are no other questions. Thank you. Thank you very much. All counsel on the case is submitted.